## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, | Civil No. 11-2412 (JRT/JSM) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| ADAM SOCZYNSKI, THOMAS HIPP, and HIPP'S TRUCKING, INC., | |
| Defendants. | |

Ryan P. Myers, **LIND JENSEN SULLIVAN & PETERSON, PA**, 901 Marquette Avenue South, Suite 1300, Minneapolis, MN, 55402, for plaintiff.

Thomas J. Laughlin, **LAUGHLIN LAW OFFICE**, 600 Inwood Avenue North, Suite 235, Oakdale, MN, 55128; and Nadezhda V. Wood, **NADIA WOOD, ATTORNEY AT LAW**, 500 Laurel Avenue, Saint Paul, MN 55102, for defendant Adam Soczynski.

Plaintiff Occidental Fire & Casualty Company of North Carolina ("Occidental") brings this declaratory judgment action against its insureds, Thomas Hipp and Hipp's Trucking, Inc. (collectively, "Hipp"). The underlying facts giving rise to this action involve a fatal truck accident. On March 10, 2009, Amy Soczynski was killed when a truck and trailer driven by Thomas Hipp collided with her vehicle. Amy's widower, Adam Soczynski ("Soczynski"), brought a personal injury action in Minnesota state court against Hipp and Airline Transportation Specialists, Inc., ("ATS"), a company for whom Hipp hauls cargo as an independent contractor. Hipp is insured by Occidental, and ATS

is insured by Great West Casualty Company ("Great West").  The parties to the state court action settled when Great West tendered its liability policy limit of $1,000,000 to Soczynski.  Occidental refused to tender its policy limit or engage in the settlement. Hipp assigned all of its causes of action against Occidental to Soczynski, and Occidental now seeks a declaratory judgment that its policy insuring Hipp does not provide coverage for damages arising out of the accident.

Both Occidental and Soczynski have moved for summary judgment on the issue of coverage, disputing the applicability of an endorsement to the Occidental policy which excludes coverage while Hipp is acting "for or on the behalf of" ATS.  Soczysnki also seeks a determination of the liability limit of the Occidental policy.  Because the Occidental policy provides coverage for the damages arising out of the accident, the Court will deny Occidental's motion for summary judgment and grant Soczynski's motion for partial summary judgment.

## BACKGROUND

## I.     THE CONTRACTOR AGREEMENT

Thomas Hipp is a truck driver and the sole shareholder of Hipp's Trucking, Inc., a Minnesota S corporation.  (First Decl. of Nadia Wood, Ex. 1 at 2, June 28, 2012, Docket No. 13.)  Hipp has hauled freight exclusively for ATS as an independent contractor since 1996.  (First Aff. of Ryan P. Myers, Ex. A (First Dep. of Thomas Hipp ("First Hipp Dep. A") 26:10-22), June 28, 2012, Docket No. 18.)

The relationship between Hipp and ATS is a critical issue in this matter and is governed by a nonexclusive Contractor Agreement entered into on March 4, 1996. (Compl., Ex. B at 1-2, Aug. 23, 2011, Docket No. 1.)  The Agreement forms a continuous lease, unless terminated by either party by giving thirty days' notice.  (*Id.*, Ex. B at 2.)  Both ATS and Hipp described the relationship formed by the Contractor Agreement as a long-term, continuous lease.  (First Wood Decl., Ex. 5 (Second Dep. of Thomas Hipp ("Second Hipp Dep. A") 56:3-5); First Wood Decl., Ex. 7 (Dep. of Thomas Medved ("Medved Dep. A") 64:14-25).)  Despite the nonexclusive nature of the Agreement, from 1996 onward Hipp did not haul freight for any other motor carriers.  (First Hipp Dep. A 26:20-22.)  Occasionally Hipp hauled freight for personal purposes.  (*Id.* 26:23-25.)

With respect to the relationship between Hipp and ATS, the Contractor Agreement provides:

> RELATIONSHIP OF THE PARTIES.  The parties intend to create by this Agreement the relationship of the CARRIER and INDEPENDENT CONTRACTOR and not that of an EMPLOYER-EMPLOYEE. CONTRACTOR and its drivers and helpers are fully trained and qualified to provide the particular service and require no supervision of their performance.  Neither the CONTRACTOR nor its employees are to be considered employees of the CARRIER at any time under any circumstances or for any purpose.  Neither party is the agent of the other and neither party shall have the right to bind the other by contract otherwise except as herein specifically provided.

(Compl., Ex. B at 1.)  The Agreement also limits ATS's "use, possession and control of the equipment as required by 49 CFR 1057, 12(c)"[1] to "the period the equipment is actually transporting a shipment pursuant to this agreement."  (Compl., Ex. B at 1.)

The Agreement requires Hipp to display ATS identification in compliance with federal regulations and to remove such identification "when Equipment is being used other than in service of [ATS]."  (*Id.*, Ex. B at 3.)  Additionally, Hipp must provide the necessary equipment for hauling ATS's freight and cargo, and is responsible for maintaining its equipment "in safe operating condition and . . . insur[ing] that at all times it will be in compliance with all safety requirements mandated by all state and federal regulatory bodies."  (*Id.*, Ex. B at 3, 7-8.)

The Contractor Agreement also requires ATS and Hipp to procure insurance.  The Agreement obligates ATS "to maintain public liability, property damage and cargo insurance coverage for the protection of the public pursuant to <u>law</u> under 49 U.S.C.

---

[1] The current regulation that this portion of the Contractor Agreement refers to is found at 49 C.F.R. § 376.12(c)(1).  The regulation provides that written leases between authorized carriers and independent truck drivers "shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease.  The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."  49 C.F.R. § 376.12(c)(1).  This regulation was promulgated in an effort "to address certain problems that threatened the public interest and the economic interest of the trucking industry.  These problems included [Interstate Commerce Commission]-authorized carriers using leased vehicles to avoid safety regulations, and confusion on the part of the public as to who was financially responsible for accidents caused by leased vehicles."  *Williamson v. Steco Sales, Inc.*, 530 N.W.2d 412, 415 (Wis. Ct. App. 1995).

10927 and regulations under 49 CFR Part 1043."[2]   (Compl., Ex. B at 9.)   Hipp is to "carry bobtail insurance coverage with respect to public liability and property damage."[3] (*Id.*)

## II.   INSURANCE POLICIES

Both ATS and Hipp acquired the insurance called for by the Contractor Agreement.   ATS obtained insurance under a policy issued by Great West ("Great West Policy"), and Hipp obtained an insurance policy from Occidental ("Occidental Policy").

### A.   The Great West Policy

Great West issued a commercial automobile insurance policy to ATS effective December 1, 2008, through December 1, 2009.   (First Myers Aff., Ex. B at 11.)   The policy provides a liability limit of $1,000,000 for covered autos, which includes Hipp's truck.   (*Id.*, Ex. B at 11, 15.)   The liability coverage section of the policy provides:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies,

---

[2] This portion of the Contractor Agreement refers to what are now 49 U.S.C. § 13906(a)(1) and 49 C.F.R. § 376.12(j), which require authorized motor carriers to maintain insurance coverage for the protection of the public.   Federal regulations require that the lease "clearly specify the legal obligation of the authorized carrier" to maintain such insurance coverage.   Additionally, the lease must specify "who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance."   49 C.F.R. § 376.12(j)(1).

[3] Bobtail insurance is also known as "non-trucking use insurance."   *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1343 (6th Cir. 1996).   Both terms are used interchangeably to describe insurance that covers truck drivers while they are driving their trucks without trailers, or when they are operating outside the service of a "federally licensed carrier[] under whose authority they operate."   *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 932 (7th Cir. 2011).

caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(*Id.*, Ex. B at 16.)   ATS qualifies as an insured under the policy with respect to any covered auto.   (*Id.*)   The policy also defines Hipp as an insured under certain circumstances, providing:

> The following are "insureds":
>
> . . . .
>
> e.   The owner, or anyone else from whom you lease, for more than 30 consecutive days, a covered "auto" with a driver while the covered "auto":
>
>> (1)   Is being used exclusively in your business as a "trucker"; and
>>
>> (2)   Is being used pursuant to operating rights granted to you by a public authority.

(*Id.*)

## B.   The Occidental Policy

Occidental issued a commercial auto insurance policy that provided coverage to Hipp from August 1, 2008, to August 1, 2009.   (Compl., Ex. A at 65.)[4]   The policy provides liability coverage under which Occidental agrees to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership,

---

[4] Hipp was insured as part of a group of truckers.   The Occidental policy lists O.M. Trucking, Inc. (the group of truckers) as the named insured on the declarations page.   (Compl., Ex. A at 65.)   Each month Occidental issued a monthly report as an endorsement to the policy which amended the schedule of vehicles that qualified as covered autos.

maintenance or use of a covered 'auto'." (*Id.*, Ex. A at 77.)  Hipp was a named insured at the time of the accident, and the 2009 Volvo semi-tractor involved in the accident was a covered auto.  (*Id.*, Ex. A at 22-24, 77.)

### 1.    Liability Limit

The liability limit of the Occidental policy is a key question in this matter.  On the declarations page, the policy indicates that the liability limit for any single accident per covered auto is $500,000.  (*Id.*, Ex. A at 65.)  A separate endorsement to the policy states, however, that the liability limit of the policy is $1,000,000.  (*Id.*, Ex. A at 75.)  This separate "Monthly Payment and Reporting Endorsement" expressly states that it "forms a part of the policy" and is also listed in the policy's schedule of forms and endorsements which all "form[] a part of the policy to be effective on the inception date."  (*Id.*, Ex. A at 66, 75.)  A series of monthly report endorsements[5] attached to the policy represent the schedule of covered vehicles for each month during which the policy is effective.  Each such monthly report lists "$500,000" as the insured value corresponding to Hipp's 2009 Volvo.  (*Id.*, Ex. A at 5, 9, 14, 18, 24, 28, 32, 36, 40, 44, 48, 52, 56, 61.)  Each monthly report in the series notes that, other than the change to the current schedule of vehicles and the premium due "[a]ll other terms and conditions of this policy remain unchanged."  (*Id.*, Ex. A at 3.)

---

[5] These monthly report endorsements are a different type of endorsement than the "Monthly Payment and Reporting Endorsement" which lists the $1,000,000 limit in liability coverage.  The monthly report endorsements are made on "Form 233 10/02" (*see, e.g.*, Compl., Ex. A at 60-64) and contain different information than the Monthly Payment and Reporting Endorsement which appears on "Form AA 1903 (10/02)."  (*Id.*, Ex. A at 75.)

## 2.      Non-Trucking Endorsement

The Occidental policy also includes an endorsement modifying Hipp's liability coverage which is central to the present dispute.  The "Truckmen – Insurance for Non-Trucking Use" endorsement ("Non-Trucking Endorsement") provides that:

> It is agreed that the insurance with respect to any automobile described in the policy and leased to a Motor Carrier under a 30 day lease agreement, is subject to the additional following provisions:
>
> 1.   This insurance applies only to the Named Insured.
>
> 2.   This insurance does not apply at any time that the covered auto is used for transporting goods or merchandise, or while such goods or merchandise are being loaded or unloaded from the covered auto.
>
> 3.   This insurance does not apply at any time that the Named Insured is operating, maintaining, or using a covered auto for or on the behalf of any other person or organization.
>
> 4.   This insurance does not apply while the covered auto is under the direction, control, and/or dispatch of any person or organization.
>
> 5.   This insurance does not apply while the covered auto is used for the towing or transporting of any trailer or semi-trailer, or while in the process of having a trailer or semi-trailer attached to or detached from it, unless such trailer or semi-trailer is owned by or leased to the Named Insured at the time loss occurs
>
> All other terms, conditions, and agreements of the policy shall remain unchanged.

(Compl., Ex. A at 104.)  Thomas Hipp testified regarding his understanding of the Non-Trucking Endorsement, and explained that the Occidental policy did not cover Hipp "under any lease.  It was – that insurance was for in between leases or when I'm doing something on my own."  (Second Hipp Dep. A 60:6-12.)

- 8 -

Occidental issued a Certificate of Insurance to Hipp on July 22, 2008, which also references the scope of the Occidental policy's "nontrucking liability" coverage.  (Second Aff. of Ryan P. Myers, Ex. A at 1, July 19, 2012, Docket No. 22.)   After listing the Occidental policy number and a coverage limit of $500,000, the Certificate of Insurance states that "[c]overage is afforded by this policy for nontrucking liability only" and references the policy's Non-Trucking Endorsement.  (*Id.*)  The Certificate of Insurance also states that "[c]overage afforded by this policy shall apply only to [Hipp] as lessor/contractor under a long term lease to [ATS.]  This coverage shall cease to apply to [Hipp] as lessor/contractor at the same time the lease agreement ceases or upon the expiration of the policy whichever comes first."  (*Id.*)[6]

## III.   THE ACCIDENT

On March 10, 2009, Thomas Hipp ran two separate errands in the 2009 Volvo semi-tractor owned by Hipp and insured by Occidental.  (First Wood Decl., Ex. 1 at 1-2; First Myers Aff., Ex. B at 11, 15; First Hipp Dep. A 85:11-22.)  In the morning, Thomas Hipp drove from his home in Ham Lake, Minnesota, to Twin Cities Mack & Volvo Trucks in Roseville, Minnesota, to have clean idle software installed on the Volvo's

---

[6] The Certificate of Insurance itself does not state that it is part of the Occidental policy. (Second Myers Aff., Ex. A.)  The first page of the policy identifies which documents form part of the policy and states: "THESE POLICY PROVISIONS WITH THE DECLARATIONS PAGE, COVERAGE FORM AND ENDORSEMENTS, IF ANY, COMPLETE THIS POLICY." (Compl., Ex. A at 67.)  In the Common Policy Declarations the policy also specifies that "[t]his policy contains all the agreements between you and us concerning the insurance afforded" and that "[t]his policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy."  (*Id.*, Ex. A at 68.)

engine.  (First Hipp Dep. A 78:9-17, 85:11-19, 87:12-13.)   Clean idle software allows truck drivers to keep their engines idling in states where environmental regulations require that engines without the software be shut off after a specified period of time, usually five minutes.  (Second Hipp Dep. A 16:5-10; First Wood Decl., Ex. 8 (Dep. of Catherine Moe ("Moe Dep. A")) 15:16-21.)

After the software was installed, Thomas Hipp drove to Blaine, Minnesota, to pick up outriggers he had ordered from Blaine Brothers Maintenance.  (First Hipp Dep. A 81:5-7, 83:20-84:8, 87:8-10.)   Outriggers are removable steel structures that can be attached to a trailer to make more floor space or distribute the weight of a load differently, allowing truck drivers to haul various types of cargo.  (Second Hipp Dep. A 29:2-16; Medved Dep. A 37:5-21.)   Because the outriggers were not ready to be picked up, Thomas Hipp drove to his home and ate lunch.  (First Hipp Dep. A 86:12-23, 89:17-21.)   After eating lunch, he returned to Blaine Brothers, at which point he loaded the outriggers into his trailer and left to return home.  (*Id.* 87:17-22, 89:17-21.)   On the way home, Hipp's trailer crossed the center line of a two-lane road and collided with Amy Socyznski's SUV, causing her death.  (*Id.* 95:5-6; First Myers Aff., Ex. F.)

Before the accident, the last directive Hipp received from ATS was fulfilled when Thomas Hipp delivered a load of cargo to Chicago on Saturday, March 7, 2009, on behalf of ATS.  (First Wood Decl., Ex. 15 at 2-3.)   After delivering the load, Thomas Hipp returned to his home and remained there until the day of the accident.  (*Id.*, Ex. 15 at 3.)   On March 10, 2009, Hipp was not under dispatch from ATS and was not logging his time

in his driver's daily log.[7]   (Second Hipp Dep. A 41:25-42:4, 50:13-25, 61:15-62:8.) Additionally, the trip to Blaine Brothers to pick up the outriggers did not appear in Hipp's maintenance logs which Thomas Hipp regularly submitted to ATS.  (*Id.* 55:5-11, 20-21.) But Hipp's truck displayed ATS's logo and federal registration numbers at the time of the accident.  (First Hipp Dep. A 17:10-24.)

### A.    Clean Idle Software

The clean idle software Hipp obtained was not necessary in order for Hipp to perform under the Contractor Agreement.  (First Hipp Dep. A 78:17-20; Second Hipp Dep. A 24:25-25:7.)  Thomas Hipp testified that he had the software installed for his own convenience.  (Second Hipp Dep. A 16:5-17.)  Keeping the truck in idle for longer than the five minutes otherwise permitted by regulations allowed Hipp to run the truck's air conditioning and heating, power personal electronics, and refuel more quickly.  (First Myers Aff., Ex. C (Second Dep. of Thomas Hipp ("Second Hipp Dep. B")), 16:25-17:13, 21:11-15, 24:16-21.)  ATS did not know that Hipp was obtaining clean idle software and did not provide incentives for doing so.  (Medved Dep. A 32:18-24; Moe Dep. A 15:3-10; Second Hipp Dep. A 24:22-25:13, 49:12-18.)

---

[7] Truck drivers are required to account for all of their time to ensure that they are in compliance with federal regulations restricting the length of time spent driving without a break and the length of breaks.  *See* 49 C.F.R. §§ 395 *et seq.*  At the scene of the accident, a state trooper cited Thomas Hipp for not having his logs filled out, and Thomas Hipp subsequently reported the day as "on duty" in order to be allowed to move his truck.  (First Wood Decl., Ex. 4 (First Dep. of Thomas Hipp ("First Hipp Dep. B")) 115:4-14; Second Hipp Dep. A 61:19-24; First Wood Decl., Ex. 16.)

### B.      Outriggers

The outriggers Hipp purchased on March 10, 2009, served to extend the length of a trailer, and were specifically designed to haul wind tower parts.  (Second Hipp Dep. A 34:7-15.)  Thomas Hipp testified that, at the time he purchased the outriggers, ATS did not have the "type of freight that would require these particular outriggers."  (*Id.* 29:17-21, 31:16-18, 34:4-6.)    Indeed, Hipp already owned and used other, differently configured outriggers to haul cargo for ATS.  (*Id.* 29:22-30:2.)  Because wind towers were becoming more popular, Hipp had purchased the outriggers to "make the trailer more marketable" to other motor carriers or to use in the event that Hipp quit working for ATS.  (*Id.* 31:23-25, 32:2-6.)    Although Thomas Hipp conceded that he may have purchased the outriggers "in anticipation of possible loads to haul for ATS," he clarified that he had not purchased the outriggers "particularly for ATS" but rather because he felt they "might come in handy some day."  (*Id.* 30:10-14.)  Additionally, ATS gave Hipp no indication that it would be able, or was planning, to offer loads that would require the outriggers purchased on the day of the accident.  (*Id.* 40:9-15.)

ATS was not aware at the time of the accident that Hipp was intending to or did purchase outriggers.  (Medved Dep. A 74:7-12; First Myers Aff., Ex. E (Dep. of Thomas Medved ("Medved Dep. B")), 35:1-3.)  The owner of ATS testified that the outriggers expanded Hipp's capability to haul freight, but were not necessary for Hipp to be able to haul ATS freight.  (Medved Dep. B 36:15-37:3.)  ATS kept track of the equipment purchased by its independent contractors and would contact the contractors if ATS had a load requiring that particular type of equipment.  (*Id.* 46:6-12; Second Hipp Dep. A

36:20-37:2.)   ATS attempted to use the special hauling capacity of its independent contractors but did not consider the ability to haul special loads an incentive for its drivers.  (Medved Dep. B 46:23-47:10, 48:20-25.)

Despite Hipp's potentially increased hauling capacity, ATS did not dispatch Hipp differently "before or after" Hipp purchased the outriggers.  (*Id.* 40:13-20.)  As of April 2012, Hipp had never used the outriggers.  (Second Hipp Dep. A 30:8-9.)  At oral argument before this Court, all parties agreed that the outriggers purchased on March 10, 2009, have never been used.

## IV.    STATE COURT LITIGATION AND SETTLEMENT

Following the accident, Soczynski, the defendant in the instant action, was appointed as the trustee for the heirs and next of kin of Amy Soczynski.  (First Wood Decl., Ex. 1 at 2.)  On January 12, 2010, Soczynski commenced a personal injury lawsuit in Anoka County District Court against Hipp, alleging that the accident was the result of Thomas Hipp's negligence.  (*Id.*, Ex. 1 at 3, Ex. 3 at 5.)  Soczynski later amended his complaint and named ATS as an additional defendant.  (*Id.*, Ex. 1 at 3.)  In his amended complaint, Soczynski alleged that, at the time of the accident, Hipp was operating the truck with the "permission and consent" of, and "under the authority of Defendant [ATS] pursuant to [the Contractor Agreement]."  (First Myers Aff., Ex. H at 57.)

On January 21, 2011, Soczynski made a demand upon the state court defendants for the policy limits of both the Great West and Occidental policies.  (First Wood Decl., Ex. 1 at 4.)  Occidental refused to tender its policy limits.  (*Id.*)  Great West, however,

tendered its policy limits of $1,000,000.  (*Id.*)  Great West tendered its policy limits on the condition that Soczynski release and discharge the liability of all defendants.  (*Id.*) Great West, Hipp, and ATS entered into a stipulation and agreement which specified that Great West's "offer and release is made with the understanding that [ATS] would maintain its denial of liability," and that "[d]ue to the possibility of exposure to a verdict greatly in excess of policy limits . . . Great West . . . made a business decision to tender its liability limits despite its available defenses."  (*Id.*, Ex. 1 at 1, 4, 6.)  Pursuant to the stipulation, Hipp assigned any and all claims or causes of action it had against Occidental to Soczynski.  (*Id.*, Ex. 1 at 8-9.)

The parties subject to the stipulation appointed an arbitrator to decide the question of damages, and Soczynski agreed that the $1,000,000 payment from Great West would be applied first to reduce any damage award.  (*Id.*, Ex. 1 at 7-8, 11.)  Soczynski further agreed not to execute any judgment "against the personal, individual, or business assets or holdings of" Hipp, and "expressly reserve[d] the right to execute on the judgment against Occidental Insurance Company."  (*Id.*, Ex. 1 at 9.)  The parties provided Occidental with a notice of their intent to enter into the agreement as well as a copy of the executed agreement and stipulation.  (*Id.*, Ex. 1 at 10.)

The arbitrator determined that the total amount of damages from the accident awardable to Soczynski was $2,750,000. (*Id.*, Ex 2.)  The Anoka County District Court found the damages awarded by the arbitrator to be reasonable and, after offsetting the $1,000,000 settlement, entered judgment against Hipp in the amount of $1,750,000. (*Id.*, Ex. 3 at 2-3.)

## V.     FEDERAL LITIGATION

On August 23, 2011, Occidental filed a complaint with this Court seeking a declaratory judgment that the Occidental policy does not provide coverage for the accident.  (Compl. at 10.)  Soczynski, having been assigned Hipp's claims and causes of action against Occidental, filed an answer and a counterclaim.  (Answer & Countercl., Sept. 13, 2011, Docket No. 2.)  In the counterclaim, Soczynski requested that the Court determine that the Non-Trucking Endorsement in the Occidental policy does not preclude coverage for the accident, declare the Occidental policy limit to be $1,000,000, and award Soczynski damages based on Occidental's bad faith in failing to tender its policy limits in state court.  (*Id.* at 4-5; First Wood Decl., Ex. 1 at 12.)

## ANALYSIS

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.      JUDICIAL ESTOPPEL

Occidental argues as a preliminary matter that Soczynski is estopped from establishing coverage under the Occidental policy.  Because Soczynski alleged in the underlying state court action that Hipp was operating his truck under the authority of ATS at the time of the accident, Occidental contends that Soczynski cannot now argue that Hipp was not acting "for or on the behalf of" ATS in order to avoid application of the coverage-barring Non-Trucking Endorsement.

Judicial estoppel is an equitable doctrine that is "intended to prevent a party from assuming inconsistent or contradictory positions during the course of a lawsuit."  *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005).  Whether to apply judicial estoppel is a question of law for the Court.  *Id.*  The doctrine "protects the integrity of the judicial process" and is invoked by a court "when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) (internal quotation marks omitted).

Because this is a diversity case, the Court "must apply" Minnesota substantive law to the question of whether judicial estoppel applies.  *See Monterey Dev. Corp v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 608-09 (8th Cir. 1993).[8]  The Minnesota Supreme Court has

---

[8] Relying on cases from a number of other Circuits, Occidental argues that the Court should apply federal law to determine whether judicial estoppel applies in this case.  The Court declines to apply federal law, because state substantive law governs the application of judicial estoppel in this Circuit.  *See Rolwing v. Nestle Holdings, Inc.*, 666 F.3d 1069, 1072 (8th Cir.

(Footnote continued on next page.)

not determined if judicial estoppel exists in Minnesota.  *See Pendleton*, 706 N.W.2d at 507.  Although the Minnesota Supreme Court has not adopted judicial estoppel, it has identified three non-exclusive factors which must generally be met before a court would invoke the doctrine: (1) "there must be a clear inconsistency between the original and subsequent position of the party"; (2) "the party presenting the allegedly inconsistent theories must have prevailed in its original position"; and (3) "there must not be any distinct or different issues of fact in the proceedings."  *Id.*

To establish judicial estoppel, the facts must demonstrate that there is a clear inconsistency in the position advanced by Soczynski in his state court complaint, and the one he advances here.  *See id.*  Soczynski has not, however, presented contradictory positions.  ATS's potential liability for Hipp's acts committed while under "the authority of Defendant [ATS]" is not inconsistent with Occidental's obligation to pay for liabilities arising out of Hipp's actions not taken "for or on the behalf" of ATS.  Essentially, application of judicial estoppel in this case would require the Court to find that the Great

_____

(Footnote continued.)

2012); *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 457 F.3d 766, 771 (8th Cir. 2006); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co.*, Civ. No. 10-4948, 2012 WL 1072329, at *10 (D. Minn. Mar. 30, 2012).  Moreover, the Court concludes that even if federal law applied to judicial estoppel, the result would be the same in this case.  Both federal and Minnesota law would require that a party advance an inconsistent position before applying judicial estoppel.  *See EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 679 (8th Cir. 2012); *State v. Larson*, 605 N.W.2d 706, 713 n.1 (Minn. 2000).  Because the Court concludes that Soczynski's current position is not inconsistent with his position taken in state court, the Court has found no iteration of judicial estoppel – federal or otherwise – which would preclude Soczynski from making the arguments necessary to establish insurance coverage in this case.

West policy and the Occidental policy are mutually exclusive.[9]  But such a finding is not supported by the law governing the liability of motor carriers and their leased truck drivers.

Under the doctrine of logo liability, it is possible for both ATS and Hipp to be liable for an accident within the meaning of their insurance policies, even if Hipp was acting on its own behalf at the time of the accident.  Logo liability arises out of federal regulations which require a trucking company (such as ATS) that leases a vehicle and driver to have "exclusive possession, control, and use" of the leased vehicle.  49 C.F.R. § 376.12(c).  Prior to 1986, federal regulations required a motor carrier to remove its logo and identification cards from a vehicle before terminating a lease.  Based on this regulation, courts created logo liability which imputed liability to the motor carrier based on the presence of the carrier's logo on the equipment involved in an accident.  *See Rodriguez v. Ager*, 705 F.2d 1229, 1231, 1236 (10th Cir. 1983).  If a motor carrier had not complied with the regulation and removed its identification materials at the end of a lease, the carrier could still be held liable for the driver's negligence, even when the truck was not being driven on behalf of the carrier.  *See id.*; *Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 136 (8th Cir. 1974).

---

[9] To the extent Occidental is arguing that Soczynski has presented inconsistent positions regarding the mutual exclusivity of the policies, the Court finds that Soczynski, at all times during the state and federal litigation, has consistently maintained that both Great West and Occidental have an obligation to provide coverage.  Nothing in the allegations of the amended complaint or the stipulation and agreement indicate that Soczynski advanced the position that coverage for ATS by Great West mutually excluded coverage of Hipp by Occidental.

In 1986, the federal regulations were amended to allow a lease between a motor carrier and a driver to state which party was responsible for removing the identification materials. Further amendments in 1992 provided that the "control" language in 49 C.F.R. § 376.12(c) was not intended to create carrier liability where none would exist under state common law doctrines of agency and vicarious liability. *See Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 730-31 (W.D. Ky. 2010). Since these amendments, the continued vitality of the logo liability doctrine remains unclear, and courts have struggled with apportioning liability in cases like the present one.[10] Both of the Eighth Circuit's applications of the logo liability doctrine predate the 1992 amendments to the federal regulations, *see Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1027 (8th Cir. 1991); *Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 136 (8th Cir. 1974), and the Eighth Circuit has not yet interpreted a motor carrier's liability in light of the amended regulations. In 2010, however, the Eighth Circuit indicated in dicta that the basic theory underlying logo liability may still be viable. *See Huggins v. FedEx Ground Packages Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010).

The Court need not decide whether logo liability exists, or whether it would apply in this case because such a determination is irrelevant to the application of judicial

---

[10] Some courts, for example, have determined that under the revised regulations, motor carriers are subject to no "greater liability for leasing the equipment than it would be if it owned the equipment," and apply basic state common law principles to determine liability as between a motor carrier and a driver. *Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242, 1248 (D. Kan. 2011). Other courts have created a rebuttable presumption that a driver is acting within the scope of his or her lease when driving a leased vehicle. *See, e.g.*, *Bays*, 691 F. Supp. 2d at 730-31.

estoppel.  What is relevant is that enough uncertainty surrounds the viability and scope of the doctrine to render Soczynski's position in state court arguably consistent with his current position under a good faith interpretation of existing law.  In other words, the possibility of logo liability renders a complaint based on ATS's authority or control of Hipp and Great West's subsequent settlement consistent with the position that Hipp was not acting for or on the behalf of ATS at the time of the accident.[11]  Therefore, the Court concludes that Soczynski has not presented inconsistent positions, but rather has consistently maintained throughout this litigation that both ATS and Hipp are potentially liable and that both Great West and Occidental have an obligation to pay.

Moreover, even if the amended complaint had alleged that Hipp was acting "for or on the behalf of" ATS at the time of the accident, nothing in the settlement entered into in state court indicates that Soczynski "prevailed" in that position.  First, the state court did not accept the factual basis for ATS's liability that Soczynski advanced in his amended complaint.  *See Pendleton*, 706 N.W.2d at 507 ("[J]udicial estoppel requires that the party have actually previously succeeded at trial on a factual theory inconsistent to the one in

---

[11]  Additionally, Occidental fails to explain how acting under the authority of ATS is necessarily synonymous with acting for or on the behalf of ATS as contemplated by the Non-Trucking Endorsement.  It is certainly possible that the amended complaint referred only to the fact that Hipp was acting under ATS's federal motor carrier "authority" by displaying ATS's logo at the time of the accident.  Therefore, Occidental has not established that Soczynski's position taken in the amended complaint – that Hipp was driving a truck pursuant to ATS's federal authority – is clearly inconsistent with its current position – that Hipp was not acting "for or on the behalf of" ATS at the time of the accident.

question.").[12]   Absent judicial acceptance of a party's original position "a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity."  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (citations and internal quotation marks omitted).   Second, the state court stipulation and agreement itself provides no indication that Great West adopted the position that Hipp was acting "for or on the behalf of" ATS at the time of the accident.  The stipulation agreement clearly states that "[t]he offer and release is made with the understanding that [ATS] would maintain its denial of liability."   Additionally, the stipulation provides that "Great West[] made a business decision to tender its liability limit despite its available defenses."   Great West never conceded that any coverage was applicable under the policy, and certainly did not determine that Hipp was acting in the business of ATS at the time of the accident such that Hipp qualified as an additional insured under the Great West policy.   Great West merely tendered the limits of its insurance policy without making any coverage determinations.   Because Soczynski has not degraded the integrity of the judicial process by abandoning a position that prevailed in a previous proceeding, the Court concludes that the doctrine of judicial estoppel is inapplicable.  *See New Hampshire*, 532 U.S. at 750; *Pendleton*, 706 N.W.2d at 507.

---

[12] *See also St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 457 F.3d 766, 771 (8th Cir. 2006) (explaining that to be estopped the party against whom judicial estoppel was sought "would have had to prevail in the state-court action by **arguing to the court**" (emphasis in original)); *Stallings*, 447 F.3d at 1049 (declining to apply judicial estoppel where "no judicial acceptance" of the inconsistent position occurred); *Sunny Fresh Foods, Inc. v. Michael Foods, Inc.*, 205 F. Supp. 2d 1077, 1090 (D. Minn. 2002) ("Judicial estoppel does not hinge on whether the party previously argued a position, but instead hinges on whether that party was successful in having the court adopt that position.").

### III.    COVERAGE UNDER THE OCCIDENTAL POLICY

To resolve the coverage dispute presented in this case, the Court must interpret the scope and application of the Non-Trucking Endorsement which provides, in relevant part, that for any vehicles "leased to a Motor Carrier under a 30 day lease agreement":

> This insurance does not apply at any time that the named insured is operating, maintaining, or using a covered auto for or on the behalf of any other person or organization.

The parties agree that if the Non-Trucking Endorsement does not apply, the Occidental policy provides coverage for the damages arising out of the accident.  Therefore, in order to conclude whether the Occidental policy provides coverage, the Court must determine whether Hipp was under a "30 day lease agreement" and acting "for or on the behalf of" ATS at the time of the accident.

#### A.    Insurance Policy Interpretation

The parties agree that Minnesota law applies to interpretation of the Occidental policy.  *See Allstate Ins. Co. v. Blount*, 491 F.3d 903, 908 (8th Cir. 2007).   Under Minnesota law, the initial burden of demonstrating coverage rests with the insured, but "the insurer carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Policy exclusions are "construed narrowly and strictly against the insurer." *Id.*

Interpretation of an insurance policy is a question of law for the Court which is properly resolved on a motion for summary judgment.  *See Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012).   In determining whether coverage exists, "general

principles of contract interpretation apply." *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). The Court must construe the terms of the policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977). "[U]nambiguous language must be given its plain and ordinary meaning." *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986). A policy is ambiguous if its language "is susceptible to two or more reasonable interpretations." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008). Ambiguous language is construed in favor of the insured. *See Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960).

Additionally, the Court construes an insurance policy as a whole. *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn. 1997). "A construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent." *Wyatt v. Wyatt*, 58 N.W.2d 873, 875 (Minn. 1953). Endorsements form part of the contract for insurance. *Associated Indep. Dealers, Inc. v. Mut. Serv. Ins. Cos.*, 229 N.W.2d 516, 520 (Minn. 1975).

### B.   Thirty-Day Lease

The plain language of the Non-Trucking Endorsement provides that the listed exclusions only apply to "any automobile described in the policy and leased to a Motor Carrier **under a 30 day lease agreement**." (Emphasis added.) The lease between ATS

and Hipp, memorialized in the Contractor Agreement, had been in continuous effect for almost thirteen years at the time of the accident, and was subject to cancellation by either party by giving thirty days' notice.  The Court must determine whether this lease was a "30 day lease agreement" within the meaning of the Non-Trucking Endorsement.

The term "30 day lease agreement" is not defined in the Occidental policy, and the parties have cited to no cases construing this phrase in the context of a trucking insurance policy.  The parties advance two possible interpretations of "30 day lease agreement." One interpretation of the phrase is that the Non-Trucking Endorsement applies only to leases that have a duration of exactly thirty days, in which case the Non-Trucking Endorsement does not apply to Hipp's lease under the Contractor Agreement.  Another possible interpretation is that "30 day lease agreement" refers to a lease with a duration of at least thirty days, bringing the Contractor Agreement within the scope of the Non-Trucking Endorsement.[13]

---

[13] In support of its interpretation that the Contractor Agreement was a thirty day lease agreement, Occidental cites to a number of state statues defining long-term or permanent leases in the trucking industry as those which last for thirty days or more.  Based on these sources, Occidental concludes that "30 day lease agreement" in the Non-Trucking Endorsement can mean only a long-term or permanent lease, such as the one that existed between Hipp and ATS. Occidental's argument is not persuasive, and the Court does not find these statutes to be helpful in its interpretation of the Non-Trucking Endorsement because all of the cited statutes include the phrase "thirty days or more."  If the Occidental policy used the phrase "a lease agreement of thirty days or more," the application of the endorsement to the Contractor Agreement in this case would be obvious and the Court would not be required to interpret the meaning of Occidental's inartfully drafted endorsement.

Occidental also urges the Court to look to the Certificate of Insurance in interpreting the meaning of a "30 day lease agreement."  The Certificate provides that "[c]overage afforded by this policy shall apply only to [Hipp] as lessor/contractor under a long term lease to [ATS].  This coverage shall cease to apply to [Hipp] as lessor/contractor at the same time the lease agreement

(Footnote continued on next page.)

After analyzing the Occidental policy as a whole, the Court concludes that the phrase "30 day lease agreement" as used in the Non-Trucking Endorsement is unambiguous and refers to a lease with a duration of at least 30 days, bringing the Contractor Agreement within the scope of the Non-Trucking Endorsement.  The term "30 day lease agreement" is unambiguous because it is subject to only one "**reasonable** interpretation."  *See Carlson*, 749 N.W.2d at 45 (emphasis added).  The Court finds that interpreting "30 day lease agreement" to mean only a lease with a duration of precisely 30 days is unreasonable in the context of the Occidental policy.

Examining the meaning of thirty days in another context highlights the unreasonableness of interpreting "30 day lease agreement" to mean only leases of exactly thirty days in duration.  For example, the Contractor Agreement is subject to cancellation by either ATS or Hipp "by giving thirty (30) days written or verbal notice."  With respect to the Contractor Agreement it would be nonsensical to conclude that if ATS provided

_____

(Footnote continued.)

ceases or upon the expiration of the policy whichever comes first."  Based on this language, Occidental argues that "30 day lease agreement" must include the Contractor Agreement, because otherwise the phrase has no meaning in the Non-Trucking Endorsement.  In other words, according to Occidental, the only lease that could be in existence in order for the Occidental policy itself to exist was the Contractor Agreement, therefore any reference to a lease in the policy must have been to that Agreement.  It is unclear to the Court how this argument advances Occidental's position.  The Contractor Agreement was a nonexclusive agreement, and nothing precluded Hipp from entering into leases with other carriers while maintaining its relationship with ATS.  Therefore, the meaning of "30 day lease agreement" is not dependent, as Occidental suggests, on the existence of the Contractor Agreement.  In any case, because the Court concludes based on the plain language of the Non-Trucking Endorsement that the Contractor Agreement is a "30 day lease agreement," it need not decide whether the Certificate of Insurance is part of the Occidental policy, or whether it can be used to aid in interpretation of the Occidental policy.

notice of cancellation of the Contractor Agreement thirty-five days before it intended to cancel, that such notice would be insufficient under the agreement because it was not the exact "thirty (30) days . . . notice" prescribed by the Agreement.   Similarly, it is unreasonable to conclude that the Non-Trucking Endorsement by using the term "30 day lease agreement" references only leases that are exactly 30 days in duration.   The fact that the Contractor Agreement had a continuous term, lasting for at least thirty days, is sufficient to bring the Agreement within the meaning of the Non-Trucking Endorsement.

Moreover, in determining whether an interpretation is reasonable, the Court is mindful that it must construe the terms of the policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Univ. Ins. Co.*, 258 N.W.2d at 572.   At the time Hipp entered into the insurance agreement with Occidental, it was under what Thomas Hipp characterized as a long-term lease with ATS.   But Hipp also understood that the Occidental policy did not provide coverage when Hipp was hauling cargo for or on the behalf of ATS while the Contractor Agreement was still in effect.   To read the Non-Trucking Endorsement as applying only to a lease of exactly thirty days would mean that the endorsement could never be effective with respect to Hipp and ATS, and that Hipp had contracted for general liability insurance – insurance which Hipp did not think he had purchased based on the inclusion of the Non-Trucking Endorsement.   Because the parties reasonably understood the Non-Trucking Endorsement to apply while the Contractor Agreement was in effect, interpreting a "30 day lease agreement" to mean only a lease of exactly thirty days in duration would fail to effectuate those expectations, and the Court declines to adopt such

an interpretation. *See Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn. 2000) ("[I]nsurance policies are interpreted to give effect to the intent of the parties."). Therefore, the Court concludes that the Contractor Agreement between Hipp and ATS constitutes a "30 day lease agreement" within the meaning of the Non-Trucking Endorsement.

### C.    "For or on the behalf of" ATS

Next, the Court must determine whether Hipp was acting "for or on the behalf of" ATS at the time of the accident, in which case the Non-Trucking Endorsement would apply and bar coverage.  The parties dispute the meaning of the phrase "for or on the behalf of" as used in the Non-Trucking Endorsement.  Soczynski argues that the phrase refers to acting as a common law agent.  Occidental argues, however, that "for or on the behalf of" broadly refers to any actions which confer a commercial benefit to another.

The Occidental policy does not define the phrase "for or on the behalf of," and therefore the Court must look to the plain and ordinary meaning of the phrase.  Webster's Dictionary defines "on behalf of" as "in the interest of," "as the representative of," and "for the benefit of."  *Webster's Third New International Dictionary* 198 (1993); *see also American Heritage Dictionary of the English Language* 685 (5th ed. 2011) (defining "on (or in) behalf of" as "as the agent of," "on the part of," "[f]or the benefit of" and "in the interest of").  Similarly, numerous courts from other jurisdictions have concluded that "on behalf of," when used in various contexts, is not strictly limited to the concept of agency, but unambiguously means in the interest of, as a representative of, or for the

benefit of.[14]  *See United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 963 (C.D.

Ill. 2009) ("[T]he FCC Rule does not say 'agent' or 'at the direction of.'  The FCC Rule

says, 'on behalf of'.  Thus, the Attorneys General need only . . . show . . . the Dealers

acted as [Defendant]'s representatives, or for the benefit of [Defendant]."). [15]  The Court

---

[14] *See, e.g.*, *Madden v. Cowen & Co.*, 576 F.3d 957, 973 (9th Cir. 2009) (concluding "on behalf of" as used in a securities law "refers to an individual or entity that makes a communication to an issuer's stockholders in the interest of, as a representative of, or for the benefit of the issuer"); *Craven v. United States*, 215 F.3d 1201, 1207 (11th Cir. 2000) (concluding that a stock transfer was "on behalf" of another where it was "in the interest of" or "as a representative of"); *Beneficial Haw., Inc. v. Kida*, 30 P.3d 895, 915 (Haw. 2001) (concluding that making a mortgage loan "on behalf of a borrower" means "in the interest of the borrower" or "for the benefit of a borrower"); *J.C. Penney Co., Inc. v. Comm'r of Econ. Sec.*, 353 N.W.2d 243, 246-47 (Minn. Ct. App. 1984) (determining that "on behalf of" within an employment services law excluding from the definition of wages any payment made on behalf of an employee to a qualified trust refers to any payment made by the employer to a qualified trust "at the request of and for the benefit of . . . the employee"); *Div. of Labor Standards v. Friends of the Zoo of Springfield, Mo., Inc.* 38 S.W.3d 421, 423 (Mo. 2001) (concluding that "[t]he phrase on behalf of is not confined to the concept of agency" (emphasis omitted)); *DeMent v. Nationwide Mut. Ins. Co.*, 544 S.E.2d 797, 801 (N.C. Ct. App. 2001) (defining "on behalf of an insured" as that done "in the interest of," "[f]or the benefit of," or "[a]s the agent of" that person (alteration in original) (internal quotation marks omitted)); *In re Estate of Miller*, 143 P.3d 315, 320 (Wash. Ct. App. 2006) (determining that in a dead man's statute which prohibits a party in interest from testifying in her own behalf, "the phrase 'on behalf of' requires the witness to testify in his or her interest or for his or her benefit"); *Heikkinen v. United Servs. Auto. Ass'n*, 724 N.W.2d 243, 253 & n.4 (Wis. Ct. App. 2006) (concluding that an individual did not need to be an agent of an organization in order to be acting "on behalf of" the organization).

[15] Soczynski cites a dictionary definition, and three courts which have relied on that definition, in support of his argument that "on behalf of" refers only to acting as an agent of and must be strictly distinguished from "in behalf of" which carries the "in the interests of" or "for the benefit of" meaning adopted by the Court.  *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 106 (3d ed. 2011) (explaining that "[a] distinction exists between in behalf of and on behalf of.  The first means 'in the interest of or in defense of' . . . the second, on behalf of, means 'as agent of, as representative of.'" (emphasis omitted)); *see also Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1224-25 (11th Cir. 2009); *Allapattah DFC Class Action Settlement Fund v. United States*, No. 08-23514-CIV, 2010 WL 6430699, at *7 (S.D. Fla. 2010); *Norwest Bank Minn., N.A. v. Verex Assurance, Inc.*, No. C8-95-2292, 1996 WL 363371, at *2 n.2 (Minn. Ct. App. July 2, 1996).  These authorities, which are not binding, do not persuade the Court that "for or on the behalf of" as used in the Non-Trucking Endorsement is ambiguous.  Simply "[b]ecause

(Footnote continued on next page.)

likewise concludes that the phrase "for or on the behalf of" is unambiguous and means in the interest of, as a representative of, or for the benefit of.

The Court further concludes that "for or on the behalf of" is unambiguous and cannot refer to a common law agency relationship, because such an interpretation is

_____

(Footnote continued.)

a word has more than one meaning does not mean it is ambiguous. The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise." *Bd. of Regents of the Univ. of Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994). In the context of the Non-Trucking Endorsement, the Court finds that an interpretation of "on behalf of" which refers only to Hipp's actions as an agent of ATS is not applicable. First, limiting "on behalf of" strictly to an agency relationship is not supported by the greater weight of judicial authority cited in the previous footnote. Second, the strict distinction between "on behalf of" and "in behalf of" relied on by Soczynski has been largely abandoned in the English language. *American Heritage Dictionary of the English Language* 162 (5th ed. 2011) (explaining that although "[a] traditional rule holds that in behalf of and on behalf of have distinct meanings," because the "two meanings are quite close, the phrases are often used interchangeably, even by reputable writers" (emphasis omitted)); Bryan A. Garner, *Garner's Modern American Usage* 94 (3d ed. 2009) (explaining that in current usage the distinction between in behalf of and on behalf of "is seldom followed"); *Webster's Third New International Dictionary* 198 (1993) (defining "in behalf of or on behalf of" collectively as "in the interest of," "as the representative of," or "for the benefit of" and explaining that the distinction between in behalf of and on behalf of "has been observed by some writers but overall has never had a sound basis in actual usage" and is "frequently not observed" in American English). The Court is mindful that in construing insurance policies, terms should be given their plain and ordinary meaning "according to what a reasonable person in the position of the insured would have understood the words to mean," *Canadian Univ. Ins. Co.*, 258 N.W.2d at 572, and therefore accords greater weight to the numerous dictionaries supporting a broader definition of "on behalf of" than the single legal dictionary relied on by Soczynski. *See Wilson v. Am. Red Cross*, 112 F. Supp. 2d 850, 854 (D. Minn. 2000) ("Whether an ambiguity exists is determined from the viewpoint of a layperson, not a lawyer."). Finally, the Court concludes that even if "on behalf of" refers only to acting as an agent, the Non-Trucking Endorsement includes the term "for" in addition to "on the behalf of." Reading the phrase together, "for or on the behalf of" must encompass actions benefitting another which go beyond the scope of common law agency. *See New Oxford American Dictionary* 657 (2d ed. 2005) (defining "for" as "on behalf of or to the benefit of (someone or something)"); *Webster's Third New International Dictionary* 886 (1993) (defining "for" as "in behalf of" and "in support of").

inconsistent with the Non-Trucking Endorsement as a whole.  A different exclusion in the

Non-Trucking Endorsement, not at issue in this case, provides that:

> This insurance does not apply while the covered auto is under the direction,
> control, and/or dispatch of any person or organization.[16]

This exclusion embodies the common law concept of agency,[17] and would be rendered

superfluous if the Court were to construe the disputed exclusion as another agency

provision.  *See Auto-Owners Ins. Co. v. Redland Ins. Co.*, 549 F.3d 1043, 1044, 1046 (6th

Cir. 2008) (construing an "in the business of" exclusion in a similar non-trucking policy

to mean something other than agency where an exclusion already existed for use "at the

direction of, under the control of, under orders from, after being dispatched by").  The

Court therefore holds that "for or on the behalf of" as used in the Non-Trucking

---

[16] The Court notes that, true to form, this portion of the Non-Trucking Endorsement is poorly drafted and clearly contains a typo.  As currently written, the exclusion would apply to preclude coverage any time anyone – including Hipp – was driving the covered auto.  This result would be absurd, because the Occidental policy would never provide coverage for accidents, as the covered auto would always be under the direction, control, or dispatch of **a** person or organization.  Clearly the exclusion must have omitted the word "under the direction, control, and/or dispatch of any **other** person or organization."  Because Occidental does not argue that this portion of the Non-Trucking Endorsement applies to exclude coverage, the Court need not determine the impact that this drafting error could have upon application of the exclusion in a different case.  *See Travelers Indem. Co.*, 718 N.W.2d at 894 (explaining that "the insurer carries the burden of establishing the applicability of exclusions").  Rather, the Court only references this portion of the Non-Trucking Endorsement as a means of ascertaining the scope of the "for or on the behalf of" exclusion which forms the sole basis of the coverage dispute in the current case.

[17] *See, e.g.*, *Vieths v. Ripley*, 295 N.W.2d 659, 664 (Minn. 1980) ("The law is clear that an agency relationship does not exist unless there are facts showing that the alleged principal had the right to **control** the agent's conduct in performing the services.").

Endorsement refers to actions taken by Hipp in the interests of, as a representative of, or for the benefit of ATS.

The Court must next determine whether Hipp was in the interests of or for the benefit[18] of ATS at the time of the accident. The parties have cited no case law interpreting when a truck driver is acting "for or on the behalf of" of a motor carrier in the context of a Non-Trucking Endorsement.[19] For a truck driver to be acting for the benefit of or to further the interests of a motor carrier there must be a direct link between the activity engaged in by the driver and the motor carrier's benefit or interests. For example, in *Auto-Owners Ins. Co.*, the court determined that a truck driver was operating to further the commercial interests of the carrier when the driver had unloaded goods and was either on his way to sleep in anticipation of hauling a load the next morning or

---

[18] The parties do not argue, and the Court does not find any basis in the facts of this case to conclude that Hipp was acting as a representative of ATS at the time of the accident, therefore, the Court only considers whether Hipp was acting for the benefit of or in the interests of ATS.

[19] Numerous courts have, however, interpreted the meaning of a truck driver acting "in the business of" a motor carrier in order to determine coverage under a non-trucking insurance policy. These courts have concluded that a truck driver acts "in the business of" a motor carrier when the truck driver is furthering the commercial interests of the motor carrier. *See, e.g., Auto-Owners Ins. Co.*, 549 F.3d at 1045; *Nat'l Cont'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 157 F.3d 610, 612 (8th Cir. 1998). Similarly, here the Court must determine whether Hipp was acting to benefit ATS's business or further the commercial interests of ATS at the time of the accident. Because application of the Non-Trucking Endorsement in this case involves a business relationship between Hipp and ATS, the Court finds that the business use exclusions interpreted by other courts are sufficiently analogous to the Occidental policy to provide guidance to the Court in determining whether Hipp was acting "for or on the behalf of ATS" at the time of the accident. *See Avemco Ins. Co. v. Auburn Flying Serv., Inc.*, 242 F.3d 819, 822 n.3 (8th Cir. 2001) (looking to judicial constructions of insurance policies with different language to aid in interpretation where "[t]he precise language in the various policies varie[d] in form, but not in substance").

driving toward the pick-up location of his next scheduled load.   549 F.3d at 1045-46.

The court explained, "[b]oth activities related to **and directly served** [the carrier]'s

commercial interests." *Id.* at 1045 (emphasis added).[20]   The court distinguished the case

from one in which a truck driver was "engaged in some frolic and detour" or "heading

somewhere for his own purposes and no other." *Id.*[21]

Although there is no Minnesota case directly on point, with respect to repairs or

improvements, courts generally require a direct relationship between the repairs

undertaken and the carrier's business before determining that the repairs served the

commercial interests of or benefitted the motor carrier.   When repairs are required to

keep the truck in a condition in which it can be driven on behalf of the motor carrier, such

---

[20] Similarly, in *Empire Fire & Marine Insurance Co. v. Brantley Trucking, Inc.*, the court found that a truck driver was acting in the business of a carrier when, while waiting for a load at the carrier's terminal yard, the truck driver decided to have his truck serviced, left the facility, picked up some auto parts, and had some other maintenance work done. 220 F.3d 679, 680 (5th Cir. 2000).   As the driver was returning to the carrier's terminal yard, he was involved in an accident. *Id.*   The court concluded the truck was being used to further the commercial interests of the carrier because the driver "was only biding his time while the cargo loaded, had the truck maintenanced, and was en route back to [the carrier]'s yard to pick up the load when the accident occurred." *Id.* at 682; *see also Liberty Mut. Ins. Co. v. Conn. Indem. Co.*, 55 F.3d 1333, 1336-37 (7th Cir. 1995) (concluding that the truck driver, who had dropped off his trailer at a terminal and was returning to the terminal from his home in order to complete delivery of the load, was acting in the business of his carrier because he was under instructions regarding a specific delivery and was responsible to the carrier for the cargo).

[21] *See also Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1028 (8th Cir. 1991) (holding that a truck driver was not acting in the commercial interests of a motor carrier where the driver was driving to his home after being told there was no cargo available for hauling and to call back in several days); *Gackstetter v. Dart Transit Co.*, 130 N.W.2d 326, 329 (Minn. 1964) (concluding, in the context of determining whether a truck driver was acting within the scope of his employment, that when the driver was returning home after receiving instructions from the motor carrier to return the next day to pick up a load, the driver was "engaged in a personal mission" and that his trip home was not "actuated by an intention to serve" the motor carrier).

repairs directly further the commercial interests of the motor carrier. *See Nat'l Cont'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 157 F.3d 610, 613 (8th Cir. 1998) (holding that because a front end alignment was required to keep the truck in compliance with federal regulations, a truck driver was acting in the commercial interests of the motor carrier when taking the truck to be aligned).[22]

The contract or lease between the truck driver and the motor carrier can provide useful evidence of the scope of repairs that further the commercial interests of or benefit the motor carrier. *See Nat'l Cont'l Ins. Co.*, 157 F.3d at 612-13 (holding that in determining whether repairs furthered the commercial interests of a motor carrier "[w]e . . . look to the terms of the service contract to determine whether [the truck driver] was fulfilling a contractual duty when he drove the truck to Eugene for a front end alignment"). When repairs are made by a driver to comply with the terms of his lease, such repairs are "to be regarded as an activity exclusively in the business of the [motor carrier] and not a personal use." *Freed v. Travelers*, 300 F.2d 395, 398 (7th Cir. 1962) (concluding that repair work done on a truck was necessary for the driver to maintain his

---

[22] *See also Hartford Ins. Co. of SE v. Occidental Fire & Cas. Co. of N.C.*, 908 F.2d 235, 239 (7th Cir. 1990) (concluding that when a truck driver had the refrigeration mechanism repaired on his trailer in order to complete delivery of frozen goods, he was acting in the business of his motor carrier while returning to pick up the truck because the driver remained in the city where the goods were to be delivered at the carrier's command and "was en route to pick up his trailer in order to complete his delivery . . . when the collision occurred"); *Great W. Cas. Co. v. Carolina Cas. Ins. Co.*, Nos. A05-1619, A05-1773, A05-1804, 2006 WL 1704125, at *7 (Minn. Ct. App. June 20, 2006) (concluding that the driver was operating in the business of the motor carrier at the time of the accident when in route to a service station because "a business or trucking use need not be limited to hauling a load; rather, as in this case, a business use can include other activities, such as driving to get placards and complete paperwork at the carrier's direction, stopping for repairs, and purchasing fuel in order to be able to haul for the carrier").

truck in "safe and proper operating condition" under the lease, and therefore was in the motor carrier's commercial interest).

With the parameters of the "for or on the behalf of" exclusion in mind, the Court has examined the facts of this case, and concludes that Hipp was not acting for or on the behalf of ATS at the time of the accident.  As an initial matter, in determining that the Non-Trucking Endorsement does not apply, the Court analyzes only the trip made by Hipp to pick up the outriggers which took place immediately prior to the accident.[23]  The trip to obtain clean idle software is separated by several hours and three other stops – first at Blaine Brothers, then Thomas Hipp's home, then Blaine Brothers again – from the trip during which the accident occurred.  In order to accurately determine on whose behalf Hipp was acting at the time of the accident, the Court must carefully consider when particular tasks or trips ended.  Absent such careful examination, the Non-Trucking Endorsement would effectively swallow the coverage provided by the Occidental policy, as personal errands could be considered business trips any time they occurred on the same day as a business trip.  *See, e.g.*, *Hartford Ins. Co. of SE v. Occidental Fire & Cas. Co. of N.C.*, 908 F.2d 235, 239 (7th Cir. 1990) (examining only the exact trip in which the driver "was en route to pick up his trailer in order to complete his delivery . . . when the

---

[23] Because the Court concludes that the Non-Trucking Endorsement does not apply to Hipp's errand to pick up outriggers, it need not determine whether, under Minnesota law, the fact that Thomas Hipp was on his way home from picking up the outriggers would take this case out of the scope of the Non-Trucking Endorsement.  *See Gackstetter*, 130 N.W.2d at 329 (concluding, in a non-insurance context, that when a truck driver was returning home he was "engaged in a personal mission" and that his trip home was not "actuated by an intention to serve" the motor carrier).

collision occurred" in determining whether a non-trucking endorsement applied); *Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1027 (8th Cir. 1991) (analyzing only the driver's "trip home" during which an accident occurred in determining whether the driver was acting "in the business" of the carrier).

With respect to the trip to Blaine Brothers to pick up outriggers, the Court concludes that no genuine issue of material fact remains as to whether Hipp was acting for or on the behalf of ATS. ATS did not require Hipp to purchase the outriggers, was not aware that Hipp was purchasing outriggers, and was unaware of Hipp's whereabouts altogether on the day of the accident. Hipp was not on assignment from ATS and had completed its most recent assignment three days before the accident took place.[24] Therefore, this case does not involve a minor personal detour in what was otherwise a trip on behalf of a motor carrier. *See Ill. Nat'l Ins. Co. v. Ohio Sec. Ins. Co.*, 452 Fed. Appx. 651, 2011 WL 6415048, at *4 (6th Cir. Dec. 21, 2011) (concluding that a driver was acting to further the commercial interests of his motor carrier even though the driver took a brief detour to look for a truck wash while otherwise returning from delivering a load for the motor carrier).

Additionally, Hipp's obligations under the Contractor Agreement support the Court's conclusion that purchasing the outriggers was not for the benefit of or in the interests of ATS. Pursuant to the Contractor Agreement, Hipp must provide the

---

[24] Although Hipp was displaying ATS identification on its truck at the time of the accident, and ultimately logged the trip to Blaine Brothers as "on duty," in light of the other evidence in the record, the Court does not find that these facts create a genuine issue as to whether Hipp was acting for or on the behalf of ATS at the time of the accident.

necessary equipment for hauling ATS's cargo. The outriggers were undisputedly not necessary equipment. ATS gave Hipp no indication that it would be able, or was planning, to offer loads that would require the outriggers purchased on the day of the accident. And the outriggers Hipp purchased were for use hauling windtowers, a type of freight which ATS did not haul. The Contractor Agreement also requires Hipp to maintain its equipment "in safe operating condition and to insure that at all times it will be in compliance with all safety requirements mandated by all state and federal regulatory bodies." Unlike repairs which are essential to the operation of a truck, Hipp's purchase of the outriggers was not connected to keeping its equipment in safe operating condition. *See, e.g.*, *Nat'l Cont'l Ins. Co.*, 157 F.3d at 613 (front tire alignment); *Hartford Ins. Co. of SE*, 908 F.2d at 239 (refrigeration mechanism on a truck hauling frozen goods); *Great W. Cas. Co. v. Carolina Cas. Ins. Co.*, Nos. A05-1619, A05-1773, A05-1804, 2006 WL 1704125, at *7 (Minn. Ct. App. June 20, 2006) ("repairs" and refueling). The outriggers were also not required by any safety regulations.[25] The fact that the outriggers were not required by the Contractor Agreement provides compelling evidence that the purchase was not made to benefit ATS or to further ATS's commercial interests.

---

[25] *See Nat'l Cont'l Ins. Co.*, 157 F.3d at 613 ("In particular, the service contract required [the driver] to assure that his truck complied with the safety requirements of 49 C.F.R. § 393 [which] provides that '[a]ll axles must be in proper alignment.' Therefore, it is clear that [the driver] was executing his contractual duty to keep the truck in conformity with federal regulations when he took the truck to Eugene for a front end alignment.").

Of great significance in the Court's analysis is the fact that the outriggers Hipp purchased on the day of the accident have never been used.  This fact alone takes Hipp's actions well outside the scope of activities which further the commercial interests of ATS.  ATS did keep track of the equipment owned by its independent contractors and attempted, when possible, to utilize the special hauling capacity of its drivers.  But in more than three years there is no evidence that ATS attempted to or has never been able to use the outriggers.  And representatives of ATS testified that ATS did not, in fact, dispatch Hipp differently "before or after" he purchased the outriggers.  Occidental has pointed to nothing in the record that explains how the purchase of the outriggers furthered ATS's business interests.  Any benefit that ATS could derive from Hipp's purchase of the outriggers is simply too remote to be legally relevant to application of the Non-Trucking Endorsement.  *See Carolina Cas. Ins. Co. v. Panther II Transp., Inc.*, 402 Fed. Appx. 62, 68 (6th Cir. 2010) (concluding that when a truck driver drove his truck to the motor carrier's headquarters for orientation to save on motel expenses for himself, any benefit that the motor carrier potentially may "have gotten . . . was so remote as to be legally irrelevant").  Therefore, the Court concludes that because Hipp was not acting for or on the behalf of ATS at the time of the accident, the Non-Trucking Endorsement does not apply and the Occidental policy provides coverage for the damages from the accident.

## IV.   LIABILITY LIMIT OF THE OCCIDENTAL POLICY

Because the Occidental policy lists its liability limit as both $500,000 and $1,000,000 in different portions of the policy, the Court must determine which liability

limit controls.   Determination of the Occidental policy's liability limit involves interpretation of the policy, and the determination is subject to the same interpretation principles outlined in the previous section.   Under Minnesota law, if an insurance policy contains endorsements that state different liability limits, these irreconcilably inconsistent provisions create an ambiguity and the larger limit controls.   *See Rusthoven v. Comm. Standard Ins. Co.*, 387 N.W.2d 642, 643-45 (Minn. 1986).   Construing the ambiguity created by conflicting liability limits in favor of the insured must not, however, "exceed the reasonable expectations of the insured."   *Id.* at 645.

The Occidental policy states the liability limit in several places.   The declarations page provides that the liability limit is $500,000.   Additionally, at least twelve monthly report endorsements incorporated into the policy state the liability limit for Hipp's 2009 Volvo as $500,000.[26]   But the Monthly Payment and Reporting Endorsement lists the liability limit for the policy as $1,000,000.[27]   The inconsistencies in the policy create an irreconcilable conflict and render the policy ambiguous.   *See Rusthoven*, 387 N.W.2d at

---

[26]   The Court notes that these 12 monthly report endorsements did not replace or supersede the original Monthly Payment and Reporting Endorsement which lists the liability limit for the policy as $1,000,000.   The 12 monthly report endorsements were prepared on a different form than the Monthly Payment and Reporting Endorsement, indicating that the Monthly Payment and Reporting Endorsement was not a part of the monthly report series. Additionally, the 12 monthly report endorsements specifically state that, other than the change to the current schedule of vehicles and the premium due, "[a]ll other terms and conditions of this policy remain unchanged."

[27] Occidental also urges the Court to consider the Certificate of Insurance as evidence that the liability limit of the Occidental policy is $500,000.   Because the Certificate of Insurance does not resolve the ambiguity in the liability limit, but merely perpetuates the irreconcilable inconsistency, the Court need not determine whether reference to the Certificate of Insurance in this case is appropriate.

644-45.  The Court construes this ambiguity in favor of Hipp and concludes that the Occidental policy limit is $1,000,000.  *See id.* at 645.  The Court further concludes that construing the Occidental policy to provide liability coverage of $1,000,000 does not exceed the reasonable expectations of Hipp.  *See id.* (concluding that resolving a conflict between liability limits of $25,000 and $1,675,000 in favor of the larger limit did not exceed the reasonable expectations of the insured).

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Soczynski's motion for partial summary judgment [Docket No. 11] is **GRANTED**;

2.      Plaintiff's motion for summary judgment [Docket No. 16] is **DENIED**.


DATED:  January 8, 2013                            _s/ John H. Tunheim_
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                    United States District Judge